Dyer D. J.
The difficulties which attend a determination •of this cause, arise, as in most collision cases occurring in the night, from uncertainty as to material facts. Witnesses on both sides have given their opinion as to the positions of the two vessels at the time of and before the collision; they have stated their estimates of distances and theories of the disaster; and counsel have endeavored in argument, even by math *796 ematical' demonstration, to maintain their views upon these questions. It is plain, however, that, considering the state of the weather on the night of the collision, points of position and distance cannot be arrived at with exactness, and that much that is claimed in this respect, perhaps on both sides, is little more than conjecture and pure theory. In such a state of. facts it is clearly important that undeniable facts be first eliminated from the mass of testimony presented, and that such facts be kept prominently in view in connection with all the circumstances of the occurrence as they are disclosed.
The collision occurred soon after midnight. From all the testimony it is clear that the wind was S. S. E.; this, indeed, is admitted on both sides. The Mason was heavily laden with a cargo of lumber. The Calkins was light. The lights of both vessels were in proper place and burning. It' was mate’s watch on the deck of both vessels. The watch on the Mason consisted of the mate, wheelsman, and one man stationed as lookout. The watch on the Calkins consisted of the mate, wheelsman, and two lookouts. The Calk-ins was sailing with the wind free, and her course was N. £ W. At sometime before the collision the Mason was sailing on the port tack, close hauled, steering S. S. W. The course on the two vessels intersected. Whether the Mason was pursuing her course, shortly before the collision, is one of the questions of fact in dispute. From libellants’ testimony it is safe to say that the Mason was sailing between four and five miles an hour. The speed of the Calkins was at least between five and six miles an hour, probably a little more, since she was sailing free and light. Both vessels were carrying full sail. The weather was thick, occasioned chiefly by smoke from burning woods on the Michigan shore, which settled over the lake and rendered navigation, in the locality of these vessels, somewhat difficult. The watch on the Mason heard three blasts of a horn, indicating a vessel sailing free. From the testimony of the crew of the Mason it would appear that these blasts were heard a little on the weather bow of that vessel, which would be the port bow if she was on *797 the port tack, sailing S. S. W., and would fee the starboard bow if she was on the starboard tack, steering eastward or south of east. Some of the witnesses are somewhat uncertain whether the horn was heard on the weather bow or nearly ahead, but the weight of the testimony on this point is as stated. Upon response being made from the Mason, with two blasts, indicating a vessel on the port tack, the horn of the approaching vessel, which proved to be the Galkins, was again heard on the Mason about ahead, but appearing, in the language of the mate of the Mason, to be working to leeward. A third blast was soon heard still more to leeward. A green light was almost immediately seen from a point to a point and a-half on the lee bow of the Mason. Very quickly both a green and a red light were visible. The two vessels were then very close, and the mate of the Mason shouted to the Galkins, “Why don’t you starboard your wheel ?” or, “Put your wheel hard up — you are running into us; ” which was answered from the Calkins with the inquiry, “Why don’t you luff?” to which the master of the Mason, who was then on deck, responded, “We are by the wind and can’t lay any higher.” The collision occurred almost instantly, the Galkins striking the Mason on the starboard side, abaft the main rigging. To this extent we have, as shown by libellants’ testimony, what may be regarded as accepted facts touching what transpired on the Mason immediately before the colisión.
The horn of the Mason was first heard on the Calkins about a point and a-half off the starboard bow. The second horn was heard right ahead, or nearly so, and the third horn was heard on the lee bow. When the first horn of the Mason was heard, the master of the Calkins, who was on deck, though it was the mate’s watch, ordered the vessel luffed up, which was done, and her course changed from N. J W. to northeast, the object of this movement being to go astern of the Mason,
The horn of the Mason was heard to leeward as this maneuver was executed. The wheelsman of the Calkins says he at first tried to luff three points to N. N. E. J E. and then he luffed her up again. The master of the Calkins says at *798 the time of the collision that the Calkins was heading N. E. by E. or N. E. by E. E., and the mate, who was at the compass, testifies that she stood N. E. by E. J E. As the course of the Calkins was changed, and immediately or very soon after the Mason’s horn was heard on the lee bow of the Calkins, the green light of the Mason was seen, but her red light was not seen at any time before the collision. The hail of the Mason to the Calkins to starboard her wheel was heard on the Calkins, but this was not done, the master of the Calkins responding to the Mason, “Whydon’t you luff?” This is admitted by witnesses for respondent. The vessels immediately struck. These may be accepted as facts shown by respondent’s testimony, touching what occurred on board and in connection with the movements of the Calkins just before the collision, and thus far, and to the extent thus stated, as to both vessels, their movements, the observations taken on board of each vessel by the crew of each, and the circumstances of the collision, we are able to proceed on what may be regarded as uncontroverted facts.
Now, in considering the respective theories maintained by libellants and respondent, there yet remains to be determined certain questions of fact, of the highest importance and open to much dispute, since they constitute the very points in controversy. What was the actual course of the Mason at the time and immediately preceding the collision? What was the actual position of the two vessels, and in what proximity were they, each to the other? Had or had not the Galkins eroBsed the Mason’s course when the course of the first-named vessel was changed from N. W. to N. E. ? These, with other incidental points of inquiry, are the great questions in the case, and as they are determined, certain conclusions seem necessarily to follow.
The libellants maintain that the Mason was on her course— that is, on the port tack — close hauled, steering S. S. W.; and their theory is that when the Calkins changed her course from N.- J W. to N. E. she was crossing, or had crossed, the Mason’s course, and that the collision was occasioned, other secondary causes contributing, by her persistent luffing to *799 eastward, and by putting her wheel down when the Mason’s green light was visible.
Respondent maintains that the Calkins had not crossed the Mason’s course, and the whole defence proceeds upon that theory. Further, that it was her duty, upon hearing the Mason’s horn, indicating that she was on the port tack, to change her course and luff to windward, for the purpose of going astern of the Mason; and that, as the Calkins struck the Mason on the starboard side, abaft the main rigging, raking her, as it is claimed, from aft forward, it must be the fact that the Mason was not on her course, but had changed her course, and was on the starboard tack steering eastward. Further, that it was impossible for the Calkins to cross the Mason’s course, and then change her own course from N. £ W. to N. E., thus going to leeward, and, as it is claimed, coming up in the wind, and by an evolution describing a circle, strike the Mason, if on the port tack on the starboard side, abaft the main rigging, from aft forward.
As the two vessels had the wind, it was the duty of the Mason to keep her course, and of the Calkins to keep away. There can be no doubt, as the horns of the two vessels were heard, that the men on the Calkins understood the Mason to be on the port tack, and that those on the Mason understood the Calkins to be sailing with the wind free.
Did the Mason pursue or did she change her course ? She had sailed from Manistee, and her port of destination was Milwaukee. Her natural course was S. S. W. There could be no object in changing her course to eastward unless st special emergency required it. No change of wind occurred, and no such emergency was presented, unless it arose, in the judgment of those in command of the vessel, by the supposed proximity of another vessel. There can be no doubt that at sometime before the collision the Mason was sailing on her course S. S. W. It is conceded by libellants, and so testified by their witnesses, that just before the collision the wheel of the Mason was put hard down, and she, to some extent, luffed. The claim of the respondent is that, when the horn of the Calkins was first heard, the wheel of the Mason must have *800 been put bard down, and that she must have gone in stays and come around upon the starboard tack. But this is wholly denied by the crew of the Mason. The lookout testifies that the course of the Mason was not changed, to his knowledge; that he was in a position to know whether there was a change or not; that she was close hauled, and that if she had been brought up a half point she would have been in the wind and the head sails would have begun to shake; that they did not begin to shake until the jib-boom of the Calkins was pointing to the Mason, and that when the two lights of the Calkins were visible the Mason’s sails were still full. The wheelsman states that when he took the wheel the Mason was on her course; that after the signal from the Calkins was heard, he received from the mate an order to keep the vessel steady and not let her run off, and that when the red light of the Calkins was alone visible he received an order from the master to put the helm hard down. He states positively that until he received this order he did not change the course of the Mason from the time he took the wheel, and it is evident that when this order was given a collision was imminent, and the wheelsman says that he then put the wheel down and lashed it, and, apprehensive of personal injury, so left it and took refuge in the vessel’s boat; further, that after he put the wheel down, and the last time he looked at the compass, the Mason was heading S. by W. The mate testifies, after stating the Mason’s course, that upon first seeing the Calkins’ green light he ordered the man at the wheel to keep the Mason up or keep her steady; that he gave no order to change her course after he took command of the deck; that she did not change her course, to his knowledge; that he would have known it if a change had occurred; that when he saw the red light of the Calkins the sails of the Mason were full, and continued so until just before the collision, when the stay-sail and jibs were shaking. The master testifies that when he heard the mate order the wheelsman to keep the Mason steady, he came on deck; that he saw- the Calkins’ green light from the lee side of the Mason; that he looked at the compass as he passed it, and that his vessel was *801 heading S. S. W.; that he gave no command to change the the helm till the green light of the Calkins disappeared and her red light was alone visible, when the collision being imminent he ordered the wheel put hard down, and the vessel swung, in response to her changed helm, as the collision occurred, going off S. S. E. This is the positive evidence upon this question on behalf of the libellants. Is the court justified in disbelieving and adopting the oposing theory of respondents, especially when the evidence in support of that theory is, to a considerable extent, inferential and argumentative ?
Witnesses swear that the Mason must have been on the starboard tack and out of her course, because otherwise she would not have been struck by the Calkins on the starboard side. But this is opposing theory and opinion to positive testimony. The wheelsman of the Calkins says he cannot tell how the Mason was heading when struck, but thinks she was heading eastward; that after she was struck she was heading about S. E. The steward testifies that as near as he can guess the Mason was heading E. S. E. Other witnesses speak of her position, after the collision, as pointing eastward. In considering this testimony it is to be borne in mind that it is a conceded fact that when a collision appeared imminent the Mason’s wheel was put hard down and was lashed to that position, so that the vessel must have been swinging up in the wind when struck. And, added to the movement thus given by a starboard helm, the force of the blow given by the Calkins would tend to accelarate that movement and swing her off in the precise direction in which it is claimed she was heading at or after the collision. The respondents’ case is destitute of any affirmative evidence other than certain alleged admissions, to which I shall presently refer, to show that when or about the time the horn of the Calkins was first heard the Mason luffed and changed her course so that she stood on the starboard tack. And I can hardly doubt that when witnesses express the opinion that she was pointing S. E., or eastward, they are speaking from observations of her position made immediately after the *802 collision, and that, too, in moments of excitement and confusion, when it was difficult to judge from the deck of the colliding vessel with accuracy. Moreover, as we have seen, the effect of the collision, added to the movement which the Mason was then making, would have a direct tendency to put her, at that instant of time, in a position varying from her previous course, while at the same time these circumstances would be consistent with the fact that she had adhered to her course until a. collision was imminent. The master of the Calkins says that he thinks the Mason changed her course because the Calkins made her green light, which indicated a vessel on the starboard tack, but this is upon the supposition that the Calkins had not crossed or was not crossing the Mason’s course; for if she did cross her course, and approached her on the leeward side, it would be the Mason’s green light that would necessarily be observed, and, as we shall hereafter see, the master of the Calkins could not know, with certainty, that he was not intersecting or had not crossed the course of the Mason. So, too, the mate of the Calkins says that if the Mason had been on the port tack and the Calkins was luffing up, according to his calculations the Calk-ins would have been at least a quarter of a mile to the eastward of the Mason, and he could not account for the situation in which the vessels seemed to be placed; but when he saw the Mason he observed that she was ahead,, crossing the bows of the Calkins, and he knew the Calkins was heading N. E. by E. J E., and then he says he knew the Mason was heading to eastward and on the other tack. But this, too, is on the supposition or conjecture that the Calkins was to windward of the Mason and had not crossed her course, and his conclusion was of course fallacious unless his supposition was right, and1 it might be wrong. In like manner the lookout, Benson, says: “The Mason was heading eastward because the Calkins was heading northward, and the Mason was crossing the Calkins’ bows; ” all of which is mere opinion, in the absence of actual knowledge of the Calkins’ position with reference to the Mason’s original course. All of this testimony is largely matter of opinion, resting upon possibly mis *803 taken supposition, and is not, I think, sufficiently convincing to overcome the positive testimony of witnesses who were on the deck of the Mason at the time of the collision. It is said by the master and mate and one of the lookouts of the Calkins, that the booms of the Mason were on the port side. But their testimony does not convince me that such was the position of the booms before the Mason starboarded her helm, just before the collision, nor until after the collision occurred, and the mate says that he saw the booms of the Mason on the port side after the collision, but did not see them before.
It is urged in the brief of the respondents’ counsel that the position of the scar on the mast of the Mason, produced by the blow from the bowsprit and jib-boom of the Calkins, is convincing evidence that the Mason was not on her course. Testimony on the part of the Calkins tends to show that on examination the star was found to be at an angle of 45 degrees. The argument is that the sides of the vessel would be the base; the fracture at the rail to the mast would be the hypothenuse, running from stern forward; and the mast to the rail, at right angles with the longitude of the vessel’s decks, would be the perpendicular. Then place the Calkins on her course at the moment of collision, hi. E. by E. J E., and lay her jib-boom and bowsprit on the scar, pointing N. E. by E. £ E., and the course of the Mason, at the moment of collision, must be E. by S. The argument is very ingenious, but it wholly ignores the posibility that the shape and position of the scar on the mast may have been produced by a change in the Mason’s course and Calkins’ line of approach when a collision was impending. And it was held in the case of The Fairbanks, 9 Wall. 420, that direct and positive oral testimony going to show that a vessel kept properly on her course, at least until a collision became inevitable, will not be controlled by the fact that the shape of the wound tended to show that the vessel could not have been, at the instant of collision, on such course, but must have changed it; it being possible enough that the shape of the wound was produced by a change in the vessel’s course, made in the last moment, to avoid a collision.
*804 Testimony of certain witnesses is produced as to statements said to have been made by the master and mate of the Mason, after the collision, as to the course of the vessel, such as, that the Mason came about and was on the starboard tack, or that she went in stays. In view of the denials interposed to this testimony, the liability of mistake in understanding, recollection and restatement of what was said by the master and mate of the Mason, and in view of all the circumstances and the present sworn testimony of libellants’ witnesses, I have concluded, after reflection, that I ought not to give these alleged admissions such weight as to overthrow the positive testimony in the case, on this question of the course of the Mason. Some of the witnesses testifying to admissions do not themselves agree in their statements of what would seem to be the same conversation. The alleged admissions consist of statements to the effect that the Mason came about from the port tack and went in stays, or went upon the starboard tack; and since, as we find from the testimony in the case, when a collision was imminent the helm of the Mason was put hard down, and she then did vary from her course and luff more to windward, it is not difficult to see how a recital of these circumstances might convey the impression that she was put in stays or on the starboard tack before the collision occurred. These alleged admissions mainly comprise the testimony, which is in the nature of affirmative proof on the part of the respondent, to show a deviation of the Mason from her course. Whatever else is presented by respondent on the question is almost wholly inferential. And after careful examination and consideration of all the evidence, I cannot say, as the result of my judgement, that the circumstances urged by respondent, and the testimony touching the alleged admissions, are sufficiently strong, in the language of Justice Clifford, in the case of The Winona, 19 Wall. 41, “to justify the court in adopting a conclusion directly opposed to the positive testimony of the witnesses who were on the deck of the vessel just before and at the time the disaster occurred. Beyond doubt, they must know what the circumstances were, *805 and the record furnishes no sufficient reason to warrant the court in imputing to them wilful falsehood.” On the whole, the conclusion is, that the Mason maintained her oourse on the port tack until peril was impending and a collision was imminent, and a change of course at that time was not a fault within the meaning of the rules of navigation.
The question of the course of the Mason being disposed of, there remains to be considered the movements of the Calkins. We have already seen what is the uncontroverted testimony on both sides touching the position of the two vessels as indicated by their horns. On the Mason, after the third horn of the Galkins was heard, her green light was seen. How long after the horn was heard the light was visible is not entirely clear, but the testimony indicates that it was immediately. The light was located about a point or a point and a-half on the Mason’s lee bow. In a very brief space of time-both lights of the Calkins were seen and continued to be visible, until just before the vessels struck, when the green light of the Calkins was shut out. On hearing the Mason’s first horn, the master of the Calkins ordered her wheel down, so that she luffed to N. E., and it was after this movement that' the horn of the Mason was heard on the lee bow of the Calk-ins. As this horn was heard, or immediately thereafter, the green light of the Mason was seen, and continued in view till the collision. The lookout, Townsend, says that when he descried the Mason’s light it was a little on the Calkins’ weather bow. From the time the Mason’s horn was first heard the Calkins continued to luff, until, at the time of the collision, she stood, as admitted by respondent, about N. E. by E. J E. The testimony on the part of the libellants tends to show that a vessel’s light could be seen from a quarter to a half a mile away. That on the part of the respondent tends to show that it eould not be seen at a greater distance than from 120 to 150 feet, though at 12 o’clock the wheels-man of the Calkins says he could see a light about 200 feet.
The lookout of the Mason says that the sound of the first horn of the Calkins indicated that she was one-half or three-quarters of a mile away; that when he saw the .Calkins’ green *806 light he thinks she was one-quarter of a mile off, and to leeward of the Mason. The mate says when the Calkins’ green light was seen, she was about one-quarter of a mile away, and that when he saw both her lights her distance was about 500 feet. The wheelsman says that when he saw the Calkins’ green light she was from 600 to 700 feet away; that when he saw her red light she was from 300 to 400 feet distant, and that when he put the Mason’s wheel hard down the Calkins was from 150 to 200 feet distant. The master testifies that when he saw the Calkins’ green light he judged she was a quarter of a mile away to leeward of the Mason, and that this light disappeared when the two vessels were between one and two hundred feet apart, and he instantly ordered the wheel hard down. Simmons, one of the crew, who came on deck from the watch below, says the Calkins was about 500 feet distant when he saw both her lights.
On the part of respondent the testimony tends to show that the two vessels were about a mile or a mile and a-half apart when the horn of the Mason was first heard, and that they were not much more than a vessel’s length apart when the Mason’s light was seen. The witnesses differ in their testimony of the time that elapsed between the first signal heard and the time of the collision, and as to the time between the discovery of lights and the collision, and in estimates of time and distance there is a greater liability to error; but' I am convinced that the Calkins’ lights were seen on the Mason before the Mason’s lights were seen on the Calkins.
Now, it is plainly shown, by respondent’s proofs, that the movements of the Galkins proceeded wholly upon the supposition that she had not crossed the Mason’s course, and I regard it equally clear that if she was about to cross, or was crossing, or had crossed her course when the signals were first heard, then the movements she made were just such as might bring the vessels together. It is a most singular circumstance that it does not seem to have occurred to the master of the Calkins, when he changed the course of his vessel, nor even when he saw the Mason’s lights, that he *807 might have crossed the latter vessel’s course. He does not appear to have paused to consider the possibility of such a contingency, nor to have reflected upon the possible effect of a change of course if such were the case. He says that his vessel had not crossed the Mason’s course, and that she was not to leeward at any time. But how could he know this in weather so thick that, as it is claimed, a vessel’s light could not be seen more than 120 or 130 feet. He gives as a reason for his statement that the Calkins was not to leeward, because she did not come up to the Mason when her horn was heard on the Calkins’ starboard bow. But if the Calkins was about to cross, or was crossing, or had just crossed the Mason’s course, if the Mason was sailing S. S. W., her horn would be heard on the Calkins’ starboard bow, and as she was then immediately luffed up and continued steadily to luff, the Mason’s horn would afterwards naturally be heard more off the lee bow of the Calkins, precisely as the testimony shows it was heard. The master of the Calkins testifies that his vessel luffed till she brought the Mason’s horn on her lee bow, and it is evident that a radical change was made in the Calkins’ course, because, acting upon the supposition that he had not crossed and was even distant from the Mason’s course, he wanted, as he says, to bring the Mason on the Calkins’ lee.
In short, if the Calkins, on a course N. W., was approaching the Mason’s course, which was S. S. W., or was about to cross it, the Mason’s horn would be heard off the Calkins’ starboard bow; then, as the Calkins luffed to N. E. and continued still to luff, the Mason’s signal would be heard more ahead, and, as the change of course of the Galkins was persisted in, if the Mason was keeping her course her horn would be heard off the Calkins’ lee bow. It must be remembered that the Calkins was being crowded up with persistence. Her wheelsman says that he luffed her up nearly east and then tried to stop her; that first he tried to bring her up three points, and then he luffed again and the collision followed. So,, in view of the movements of the Calkins, the points from which the horns were heard as stated by re *808 Bpondent’s witnesses, are quite consistent with a probability that the Galkins was about crossing and crossed the Mason’s eourse. So, too, if the Galkins was approaching the Mason’s course it is not unreasonable that her first horn should be heard on the Mason, a little off her weather bow, as testified, and if she crossed, and as she changed her course, her horns would be heard on the lee bow of the Mason, as further testified.
Then, considering the question with reference to the lights of the two vessels, we find that a green light was first seen from the Mason, and this would be the light first seen, either as the Calkins crossed, or after she had crossed the Mason’s course; then both lights of the Calkins appeared, which would naturally result from the Calkins’ change of course to eastward, if she was to leeward and the Mason was on her course. Then, on the Calkins, the green light of the Mason was seen, and her red light was not, at any time before the collision. This, too, is consistent with the approach of the Calkins on the lee of the Mason, because the latter vessel’s green light would be on the starboard side; so, as to both signals and lights, it is found that the testimony is consistent with libellants’ claim, that the Mason was on her course, and that if the Calkins crossed the Mason’s course and then changed her own course and approached the Mason, as indicated, the lights of the Calkins would be seen on the Mason, in the order and from the points stated by her own crew.
As before stated, evidently the master of the Calkins, from the moment the horn of the Mason was heard, assumed that he was all of the time to windward of the Mason’s course, and did not pause to consider the possibility of error. In this I am convinced he made a fatal mistake. He was warned by the horns of the Mason that she was on the port tack. He knew the Calkins was sailing with the wind, and when the first horn of the Mason was heard off his vessel’s starboard bow he was admonished of danger in changing his course to eastward, for by so doing there was liability that he was going toward the Mason instead of from her, *809 and that he was thereby approaching her instead of keeping away from her.
It is a circumstance of moment, in this case, that even after the green light of the Mason was seen on the Calkins the latter vessel’s wheel was kept hard down. This had a tendency to bring the vessels nearer together, and why, when the Mason’s green light was seen, the Calkins’ helm was not star-boarded, so that she might bear away, is unexplained. It is true, undoubtedly, that the vessels were near together and that the time for action was very short, but no attempt appears to have been made to arrest the movement which the Calkins was making under a helm which had changed her course.
Even when the master of the Calkins heard the hail of the Mason to starboard his wheel no change was made, and the only response he gave was a hail to the Mason to luff and push up into the wind. And at last, instead of endeavoring to maintain a position, when, as to their lights, the two vessels would display only green to green, such a movement was persisted in as brought in view the red light of the Calkins, and even ultimately shut out the green light.
But it is said that the Calkins struck the Mason on the starboard side, abaft the main rigging from aft forward, and it is urged with much force, by the learned counsel for respondent, in support both of the view that the Mason changed her course and that the maneuver of the Calkins was proper, that the collision could not have occurred if the libellant’s theory of the disaster is right. Masters of vessels called by respondent have been asked, supposing the Mason was heading S. S. W., with the wind S. S. E. and the Calkins heading N. W., and they should hear each other’s horns about a mile apart, and the Calkins should hear the Mason’s horn on her starboard bow, whether the Calkins, with her booms aft to the rigging on the port side, could go to the leeward and westward of the Mason and make a circle so that she would strike the Mason abaft the main rigging on her starboard side from aft forward, and they have answered that she could not, although one of the witnesses states it as *810 his opinion that under such a state of the case the Calkins could strike the Mason from forward aft. The witnesses who were on the vessel at the time of the collision are not wholly united in recollection or understanding of the precise man* ner in which the Calkins struck the Mason, and it cannot be assumed, as an absolute certainty, that the blow was received wholly from aft forward. It is, however, true that some of the libellant’s witnesses so state. The question, as put to experts and answered by them in the negative, assumes that the position of the Mason on a S. S. W. course remained unchanged to the very moment of the collision. It assumes the vessels to be a certain distance apart, and that the Calkins described a circle in her movement after crossing the Mason’s course, and in such movement came up into the wind’s eye, or nearly so. Now, it is to be borne in mind that the wheel of the Mason was put hard down when a collision was imminent, so that she was coming up in the wind and could not have been pointing S. S. W. at the moment when struck. Both vessels were in motion, and the Calkins was moving under a helm that had changed her course from N. J W. to N. E. by E. £ E. It is by no means certain, from the testimony, that she ceased luffing even at that point, because it is evident that the luffing movement was most persisently adhered to, and even when the hail of the two vessels was exchanged the master of the Calkins renewed his order to put the wheel hard down. So that, from these movements of the two vessels, it would appear that in this respect the question put to experts omits conditions which existed in the case. Further, the distance that the vessels were apart cannot be stated with certainty. If nearer than supposed, the movement of the Calkins would be less descriptive of a circle; and it is evident from the testimony that her change of course was abrupt and decisive, and was made under full sail and speed, as stated by one of respondent’s witnesses. If the Calkins could make such a movement and strike the Mason on a S. S. W. course, from forward aft, then it is not difficult to understand, especially if at the moment of collision the two vessels were pressing up into the wind, as the *811 proofs clearly indicate one vessel might strike the other at right angles, or to some extent from aft forward.
On the whole, after bestowing much consideration upon this case, although I have not at all times been free from doubt, it has become a settled conviction in my mind that this collision was occasioned by the fault of the Calkins, and such will be taken as the judgment of the court.
Note. — This judgment was affirmed, on appeal, by Drummond, O. J.