## Case No. 2,765.

### The CITY OF PARIS.

### [1 Ben. 174.] [1]

District Court, E. D. New York. May, 1867. [2]

COLLISION IN NEW YORK HARBOR — STEAMER AND SCHOONER — LOOKOUT — CHANGE OF COURSE IN EXTREMIS.

1. Where a steamer going to sea through a crowded harbor, chose a passage between two vessels at anchor, and seeing a schooner crossing the passage, at once starboarded her helm to go under the schooner's stern if possible, and slowed and stopped her engine, and the schooner, which had not kept a good lookout, on seeing the steamer as she passed by the vessel which was anchored off the steamer's port bow, luffed a little, and then kept off immediately, and the steamer struck the schooner near her foremast and sunk her, *held*, that the steamer had no right of way out to sea through the passage in question.

2. Though the steamer did all she could after undertaking the passage, she was in fault for not stopping sooner. Having kept on and placed herself in a position involving danger of collision, and well calculated to excite alarm, she must be *held* responsible for the consequences.

3. The schooner's luff did not appear to have prevented her from passing the steamer's track, but if it did, being a movement made in extremis, and under the alarm caused by the near approach of the steamer, it was no ground for holding her chargeable.

[Cited in The Havilah, 33 Fed. 877.]

4. If the court could see that the careless watch on the schooner had contributed to the collision, she would have been held in fault; but with a good lookout she would have been bound to hold the course she did till the luff,

---

[1] [Reported by Robert D. Benedict, Esq., and here reprinted by permission.]

[2] [Affirmed by the circuit court (case not reported). Decree of circuit court affirmed by supreme court in The City of Paris, 9 Wall. (76 U. S.) 634.]

and the luff, if it was a false manoeuvre, was not caused by the want of a lookout, but by the dangerous attitude of the steamer.

[See note at end of case.]

In admiralty. This action was brought [by Henry P. Simmons and others] to recover the sum of $7,200, being the alleged value of the schooner Percy Heilner, which vessel, while proceeding across the North river to Jersey City, was sunk by a collision with the steamer City of Paris, at the time proceeding down the river bound to sea. The place of the collision was below the Battery, and to the east of Ellis' Island,—the time, about nine o'clock in the morning,—the tide, ebb,—the weather clear, and the wind blowing freshly from the E. N. E. The river below the Battery was quite full of vessels, riding athwart the river, tailing to the west, so that the passage of vessels down the river was much obstructed. Just to port of the direction of the Narrows, and east of Ellis' Island, there was an opening between the stern of the brig Hermania and one or two vessels lying to west of and a little below her. This opening formed a passage, which, although of sufficient width to permit the steamer to pass through, was too narrow to allow her to change her direction more than a point or two, when once her course was laid for it; and, as the wind and tide were, when once in the passage, she could not stop, without danger of being driven upon the vessels to the west and below. The schooner was sailing before the wind, upon a course which would carry her across this passage, passing from east to west, a short distance below the brig, and her rate of speed was such as to bring her to the passage at about the same time with the steamer. Some doubt appears to have existed in the minds of those in charge of the steamer as to where they should pass through the fleet of vessels which lay before them, and after consultation the opening described to the west of the brig was selected. When the schooner was first seen by those in charge of the steamer, the steamer was heading for the middle of the passage in question, and the schooner was in range of the brig off the steamer's port bow. As soon as the schooner was seen, the wheel of the steamer was put hard-a-starboard, and the engine slowed. When she had swung a point and a half to the east, and as far as it was safe to swing, for fear of the brig, her course was steadied, and the engines stopped, but her headway continuing, she passed the brig and came in contact with the starboard side of the schooner. Being then in danger of getting on the vessels to the west, she started her engine again, and pushed through the passage with the schooner hanging to her bow, and when through, backed off from the schooner which at once sank.

Owen, Gray & Owen, for libellants, argued:

1. That the steamer was in fault upon the facts, (a) in that she was running at too high

a rate of speed for a crowded harbor, (b) in that she was not slowed down before coming up to the narrow passage between the vessels, (c) in that she did not have a proper lookout, and (d) in that she was not stopped soon enough.

2. That it was the statutory duty of the steamer to "keep out of the way" of the schooner, and not having done so, she is responsible for the consequences of the collision, unless she has succeeded in showing that she was prevented from so doing by the schooner not keeping her course. 13 Stat. 60; The Fairbanks [9 Wall. 420], Judge Betts; 13 Eng. Adm. R.

3. That the claimants had failed to show that the schooner did not keep her course, as the law required her to do, but that the weight of the testimony was that she did keep her course.

4. That if the schooner did luff, and then immediately kept off, as claimed by the steamer, still that furnished no excuse for the steamer. Even in such case she might and could have, with due and proper precautions, avoided the schooner. (a.) Such luffing and then keeping off did not embarrass the movements of the steamer. Her wheel had been put to starboard, and there it was kept, as was testified, until the collision. There was no changing of the wheel in consequence of such alleged luffing. All that was done by the steamer after the luffing was to stop and back. This was what ought to have been done before coming into such dangerous proximity. (b.) But the weight of testimony shows that by the alleged luffing the schooner did not materially change her course or lose time.

5. That even if the schooner had committed an error by luffing as alleged, still she was not responsible for any of the consequences that accrued therefrom. She did not voluntarily bring herself into the danger in which she found herself. She had not previously committed any fault in her navigation, but she was brought into such danger by the improper navigation of the steamer, in coming down at great speed, and in attempting to pass through the narrow opening between the bow and the stern of the vessels at anchor. This comes clearly within the rule upon this subject. The Genesee Chief, 12 How. [53 U. S.] 450; The Pacific, 21 How. [62 U. S.] 372. A change of course "in extremis" is not held to be a fault.

T. C. T. Buckley and R. D. Benedict, in behalf of the steamer, argued the following points:

1. In this, as in all other cases of collision, no presumption of liability arises from the fact of collision. The John Frazier, 21 How. [62 U. S.] 194; The Morning Light, 2 Wall. [69 U. S.] 557. Before the loss occasioned by a collision can be fastened on a party, it must be established by preponderating evidence that the loss has been occasioned by his culpable neglect. The Ligo, 2 Hagg. Adm. 356, 360.

2. It is urged that the rules of navigation established by the act of 1864 establish that in all cases of collision occurring between a sailing vessel and a steamer, proof of the mere fact of collision is sufficient, and the fifteenth article is invoked in support of the claim. Such latitude of construction would not only be subversive of the purposes for which it is presumed the rules were adopted, but it is opposed to the language of the nineteenth and twentieth articles of the same code, which preserve in their full integrity all rules which have heretofore formed part of the general maritime code regulating the duty of sailing vessels and steamers approaching on opposite courses.

3. One of the most elementary of those rules requires that there should be a proper lookout. By that is clearly meant a person engaged in observing the movements of approaching vessels; and where such a duty is not discharged at all, or defectively discharged, to say the least, the burden is cast on the side where such fault is shown to exist, of clearly satisfying the court that absence of a lookout in no wise contributed to cause the collision. The Saxonia [1 Lush. 410]. The schooner had an absolutely free wind, and was crossing a thoroughfare which was the legitimate track of outward-bound steamers, and if the law imposes on such steamers the obligation to give way to her, the correlative obligation also exists that the schooner shall observe the movement, and do nothing to thwart or impede it.

4. Another rule of equal force has also been established by numerous decisions,— Parker v. The Scotia [Case No. 12,512]; Caldwell v. The State of Maine [Id. 2,304],—to wit: that a sailing vessel approaching a steamer shall keep her course, and the steamer has the right to regulate her movements on the supposition that such a rule will be fully complied with. The law in relation to collisions between steamers and sailing vessels is laid down very fully by Judge Betts, in the case of The New Jersey [Case No. 10,161]. It is just as good law now as it was before the adoption of the regulations for the prevention of collisions. They merely made statutory what was previously the law of the sea in such cases. And from the law, as laid down by Judge Betts, it is clear that the libellants cannot recover in this action in either of the three following cases: (1.) If the schooner had no competent and careful lookout, unless she establishes that the want of it in no way contributed to the collision. (2.) If she changed her course so as to throw herself across the steamer's track. (3.) If she could have avoided the collision by any manoeuvre, when she saw or could have seen that the steamer could not avoid her without it.

5. The schooner had no proper lookout, as was shown by the testimony.

6. She altered her course, and was in fault in so doing, and the case does not come within the rule of a change "in extremis," because if it was made in fright by those on the schooner, that fright was not caused by any movement on the steamer's part, but because she had not been seen as she should have been, owing to the negligence of the schooner's lookout.

7. After changing her course she should have kept on instead of shifting her helm again.

8. As to the faults charged against the steamer, it would have been very imprudent for the steamer to stop as she approached the passage, for she would have lost steerage way, and would have been carried down on the vessels at anchor. But she had as good a right of way out to sea, as the schooner had across to Jersey City, and all that could be reasonably required of her was that she should pursue her course at a moderate rate of speed, and keep a sharp lookout; and both of these things she did.

9. The steamer has shown that she could not have avoided the collision; while the burden of proof is thrown upon the schooner in consequence of her want of a lookout, to establish that she could not avoid it, and this she has failed to do.

BENEDICT, District Judge. It is manifest that this steamer, having run down a sailing vessel, in broad daylight, must be held responsible for the loss unless it appears that the accident was caused by some false manoeuvre on the part of the sailing vessel.

Such a manoeuvre is charged here, and it is insisted that the cause of the collision was a sudden luff made by the schooner after she had passed the range of the brig's stern, which threw her under the bows of the steamer.

The evidence shows, that some such movement did take place at the time indicated. What the movement was is best shown by the testimony of a pilot who was watching the two vessels from the deck of the brig, who says that when the schooner was abreast of the brig's stern "she came to, luffed a little, and then kept off immediately after she luffed."

It is not claimed that this movement on the part of the schooner had any effect to change the course, or speed, of the steamer; but it is insisted that it caused unnecessary and unexpected delay on the part of the schooner in crossing the passage; and several witnesses from the steamer express a confident opinion that the time thus lost was sufficient to have enabled the schooner to pass the steamer's bows in safety.

The schooner was, however, moving rapidly before the wind. She did not come to till abreast of the brig's stern, and filled away again instantly. The point of first contact was her foremast, and when struck, her position was some one hundred or one hundred and fifty yards to the west of the range of the brig's stern. The delay caused by the luff must therefore have been very slight, and to determine positively that it was the cause of the collision, would involve a nicer calculation than could be safely based upon the facts proved here.

But if the delay was the cause of the collision, it cannot be charged upon the schooner as a fault, for the luff was made in extremis, and was caused by the close proximity of a large steamer, made more dangerous from the fact, that owing to the position in which the steamer had placed herself, she could neither stop her way, nor sheer further to the east.

As I view this case, the collision was caused by the fault of the steamer in attempting to pass through a narrow passage across which she saw, or ought to have seen, that a sailing vessel must pass at the same time. It is indeed true, as claimed on behalf of the steamer, that she did all that she could after she had undertaken the passage; but she should have stopped sooner, and had she done so, no collision would have occurred. I do not assent to the claim set up here on behalf of the steamer, that "she had as good a right of way out to sea, as the schooner had across to Jersey City, and all that could be reasonably expected of her was, that she should pursue her course at a moderate rate of speed, and keep a sharp lookout."

The sailing vessel having taken a course which lay across the passage in question, in plain sight, had a right to continue upon it, and the steamer should have stopped before she came to the passage. She had no right of way out through the passage, when the course and speed of the schooner was such as to make it dangerous to attempt to pass through it; having kept on, although at moderate speed, and placed herself in a position involving danger of collision, and well calculated to cause alarm, she must be held responsible for the consequences.

In arriving at this conclusion, I have not overlooked the fact that the schooner was not keeping such a lookout as is required of a sailing vessel when moving across a crowded harbor. If I could see that the careless watch kept on the schooner contributed in a material way to the accident, I should hold her in fault. But with ever so bright a lookout, the schooner would have been bound to hold the course she did up to the luff, and the luff if a false manoeuvre, was not caused by want of lookout, but by the dangerous attitude which the steamer was seen to present.

Decree for libellant, with order of reference to ascertain the amount of damage.

[NOTE. Pending the reference the Delaware and Mutual Safety Insurance Companies petitioned to be joined as colibellants, on the ground that they had paid to the owners of the cargo the amount of the insurance for a total loss, and thereby became substituted in the place of the owners, and to their right of recovery against the libelled vessel, and the

couit granted the prayer of the petition. See Case No. 2,766.

[There was a final decree in favor of libellants, which was affirmed by the circuit court (case unreported), and from this decree of affirmance the claimant, The Liverpool, New York & Philadelphia Steamship Company, appealed.

[The supreme court affirmed the decree below for the reasons stated by Mr. Justice Swayne, i. e. that the steamer was in fault for maintaining a rate of speed higher than was consistent with the safety of other vessels in so crowded a thoroughfare; that the acts of the schooner, complained of as contributing to the disaster, were done in extremis and in the excitement of the moment; that their wisdom could not be inquired into; and that the evidence failed to show any ground for holding the schooner responsible in any degree for the casualty. The City of Paris, 9 Wall. (76 U. S.) 634.]