## THE FAIRBANKS.

Direct and positive oral testimony on a libel for collision between a steamer and a brig, going to show that the brig kept properly on her course, at least until the collision became inevitable, will not be controlled by the fact that the shape of the wound on the steamer tended to show that the brig could not have been at the instant of collision on such course, but must have changed it; it being possible enough that the shape of the wound was produced by a change in the brig's course, made, in the last moment, to avoid a collision rendered, in truth, unavoidable by the steamer's erroneous manœuvres, near the same time.

APPEAL from the Circuit Court for the Southern District of New York, in which court the owners of the brig Santiago filed a libel against the steamer Fairbanks, to recover damages sustained by the brig in a collision with the steamer.

The collision occurred in a fair, mild night of June. The weight of testimony from witnesses went to show that the brig had properly kept on her course, which was about north by east, and that the steamer, which was running about south by west, had not properly avoided her. Opposed to which was a fact, testified to by some witnesses, and which *seemed* to inspection to be true, viz., that the steamer had been struck in the collision by a square blow, indicative of the fact that the approach of the brig was at right angles.

The District Court decreed in favor of the brig. The Circuit Court on appeal reversed the decree.

*Mr. J. C. Carter, for the appellant; Mr. R. D. Benedict, contra.*

Mr. Justice CLIFFORD gave the details of the case, and delivered the opinion of the court.

Rules and regulations for preventing collisions on navigable waters, between ships and vessels engaged in our mercantile marine as well as between ships and vessels in the navy of the United States, have been prescribed by Congress.

Steam vessels, when under way, are required to carry a bright light at foremasthead, so constructed as to show a uniform and unbroken light over an arc of the horizon of twenty points of the compass, so fixed as to throw the light ten points on each side of the ship, to wit, from right ahead to two points abaft the beam, on either side, and of such a diameter as to be visible, on a dark night with a clear atmosphere, at a distance of at least five miles. They are also required to carry a green light on the starboard side and a red light on the port side, so constructed as to throw a uniform and unbroken light over an arc of the horizon of ten points of the compass, so fixed as to throw the light from right ahead to two points abaft the beam, the former on the starboard side and the latter on the port side, and of such a character respectively as to be visible, on a dark night, with a clear atmosphere, at a distance of at least two miles. Both of the colored lights are required to be so fitted with inboard screens, projecting at least three feet forward from the light, so as to prevent these lights from being seen across the bow.*

Sailing ships, under way, are required, by the first-named act, to carry the same lights as steamships, under way, with the exception of the white masthead light, which they shall never carry.

Reference will only be made to two or three of the sailing rules enacted by Congress, as none of the others have any application in this case.

By the fifteenth article it is provided that if two ships, one of which is a sailing ship and the other a steamship, are proceeding in such directions, as to involve risk of collision, the steamship shall keep out of the way of the sailing ship. Steamships, when approaching another ship so as to involve risk of collision, are also required to slacken their speed, and, if necessary, to stop and reverse; and the eighteenth article provides that where one of two ships is required to keep out of the way the other shall keep her course, subject

---

* 13 Stat. at Large, 58; 14 Id. 228, § 11.

to the qualifications that due regard must be had to all dangers of navigation, and to any special circumstances which may exist in any particular case, rendering a departure from those rules necessary to avoid immediate danger.*

Sailing vessels employed in the mercantile service were not required to carry lights before the passage of the first-named act of Congress, but the sailing rules as previously defined by the decisions of this court in the particulars under consideration, were in substance and effect the same as those enacted by Congress, as appears by several reported cases.†

Beyond question those cases show that a steamship when approaching a sailing vessel must keep out of the way, and that sailing vessels are required to keep their course in order that the steamship may not be led into error or be baffled in her endeavors to keep out of the way. Bound to keep out of the way, the steamship may go to the right or left, and in order that she may determine the matter wisely, so as to prevent any disaster, the correlative duty is required of the sailing vessel that she shall keep her course.

Many of the material facts in this case are either without dispute or are so fully proved as not properly to be regarded as the subject of controversy. Both parties agree that the collision occurred at eleven o'clock in the evening of the fifth of June, 1864, off the coast of New Jersey, some fifteen miles east of the Highlands. Just before it occurred the brig was heading north by east, and was bound for the port of New York on a voyage from Turk's Island, and the witnesses agree that the wind was southeast and that the brig, when closehauled, would lay within six points of the wind, so that she had the wind five points free. Though not stormy it was rather dark, as there was some haze on the water, but the brig was sailing four or five knots an hour, and there were no other vessels in sight. On the other hand, the steamer was bound on a voyage from the port of New York

---

* 13 Stat. at Large, 61.

† Steamship Company v. Rumball, 21 Howard, 383; St. John v. Paine 10 Id. 583: The Genesee Chief, 12 Id. 461.

to Washington, and was heading south by west, and her speed was eight knots an hour.

Some conflict exists in the testimony as to the point whether the brig had the required lights and whether she kept her course as alleged in the libel, or whether she changed it as alleged in the answer, but it will be sufficient to state the facts as they appear to the court without reproducing the testimony of the witnesses or attempting to reconcile their contradictory statements.

The vessels were less than half a mile apart when the brig was descried by the steamer, and it is satisfactorily proved that the brig had the required lights and that her lookouts were properly stationed on the forward part of the vessel. At that time it was the master's watch on board the steamer, but the better opinion from the evidence is that he was in the pilot-house and not on deck, as stated in his deposition. He admits, however, that he saw the approaching vessel, and that he knew that it was a sailing vessel, and his statement is that he changed the course of the steamer from south by west to south-southeast, which cannot be correct, because if he had done so there could not have been any collision, as the speed of the steamer was double that of the brig. But the second mate was on deck at the same time, and he states that the master was in the pilot-house, and that he went to the pilot-house where the master was and told him that there was a vessel ahead, and that the master directed the man at the wheel to change the course of the steamer half a point to the eastward; that he then went forward and walked around; that it appearing to him that the brig had also changed her course in the same way, he went back to the pilot-house and so informed the master, and that the master then told the wheelsman to let the steamer come up half a point more to the eastward. When the master gave the second order he came out of the pilot-house, as the second mate testifies, and looked at the approaching vessel. Beyond question he must at once have discovered that the order just given was insufficient to prevent a collision, and he immediately returned to the pilot-house and directed the helms-

man to change the course to southeast, which is the order he should have given in the first instance. But it is evident that his memory is unreliable, as it is clear that the collision could not have occurred if he had given that order, or the one he says he gave, when the brig was first seen by the steamer.

Precautions must be seasonable to be of any avail, but it was too late when he gave the last order, as the second mate testifies that the jibboom of the brig, by the time the order was obeyed, was not more than thirty yards from the steamer. Even if tested alone by the testimony of the witnesses on board the steamer the court is fully satisfied that the first two orders were not of a character to avoid a collision, and that the third order was not given in season to accomplish the desired result. Confirmed as this theory is by the testimony of the mate and pilot of the brig, the court has no hesitation in adopting it as correct.

Suppose the fact to be so, still it is contended by the claimants that the decree of the Circuit Court must be affirmed, because they insist that the brig changed her course, and that if she had kept it, as she was bound to do, the collision would not have occurred. Grant that the conclusion would follow if the theory of fact involved in the proposition was correct, still the views of the claimants cannot be sustained, as the fact alleged is not satisfactorily proved.

From the time the steamer was first seen to the time of the collision the deck of the brig was in charge of her mate, and he testifies positively that the brig did not change her course, as is supposed by the claimants; and the pilot of the brig, who went below before the collision, testifies that her course when he left the deck was north by east, and that when he came on deck, just before the collision, no alteration had been made in the course. No witness examined in the case on either side is able to support that theory by any positive statement, but the attempt of the claimants is to establish the theory by circumstances, of which the principal one is the appearance of the steamer where she was struck by the brig on her starboard bow. They contend that it was

a square blow, and that the character of the injury to the steamer shows that the approach of the brig was at right angles and not head on, as they were substantially approaching when each was first descried by the other.

Although it must be admitted that the argument is ingenious and exceedingly well put, still the decisive answer to it is that the circumstances adduced do not satisfy the court that any such change of course was made by the brig as is supposed, certainly not until the proximity of the two vessels was so close that a collision was inevitable, and then it is quite clear that the steamer made a sudden change, and it may be that the brig also changed her course, as is supposed by the claimants. Fault, under such circumstances, will not be imputed to the vessel required to keep her course if she was otherwise blameless.* An error committed by the vessel required to keep her course, after the approaching vessel is so near that the collision is inevitable, will not impair her right to recover for the injuries resulting from the collision if she was otherwise without fault, for the reason that those who put the vessel in that peril are chargeable with the error, and must answer for the consequences which it occasioned.† Examined in the light of these suggestions, our conclusion from the evidence is that the steamer was wholly in fault.

DECREE REVERSED, and the cause remanded with direction to

AFFIRM THE DECREE OF THE DISTRICT COURT.

---

\* Steamship Company v. Rumball, 21 Howard, 384.

† Bentley v. Coyne, 4 Wallace, 512.